**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES E. PASCENTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 445** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Pascente seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and after careful review of the record, the Court now affirms the Commissioner's decision.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on November 23, 2009 and DIB on January 5, 2010, alleging in both applications that he became disabled on September 2, 2008 due to bipolar disorder and paranoia, and later adding complaints of neuropathy and pain in his left leg, back pain and depression. (R. 162-66, 192, 246, 264). The Social Security Administration denied the applications initially on April 7, 2010, and again upon reconsideration on September 8, 2010. (R. 94-

102, 107-14).  Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Judith S. Goodie (the "ALJ") on July 14, 2011.  (R. 53). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Richard T. Fisher (the "VE").  Shortly thereafter, on August 26, 2011, the ALJ found that Plaintiff is not disabled because there are a significant number of light jobs he can perform.  (R. 32-46).  The Appeals Council denied Plaintiff's request for review, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that (1) the ALJ failed to account for all of his mental limitations, resulting in a flawed RFC; (2) the flawed RFC led to an incomplete hypothetical question to the VE, compromising the vocational testimony; (3) the ALJ provided no basis for finding him capable of performing light work; and (4) the ALJ erred in finding that he would only be off task for four minutes per hour.  As discussed below, the Court finds no merit to any of these arguments.

## FACTUAL BACKGROUND

Plaintiff was born on May 14, 1959, and was 52 years old at the time of the ALJ's decision.  (R. 162).  He completed the 10th grade and has worked at various times as a sandblaster, mechanic, park attendant/janitor, truck driver and telemarketer.  (R. 60, 198, 223-27).  Most recently, Plaintiff worked for seven years as a mailer for the Chicago Sun Times, inserting advertising into the paper and piling bundles onto pallets.  (R. 193, 194, 228).  He was fired from the mailer

job on September 2, 2008 because he hit someone during an altercation. (R. 58, 193).

## A.    Medical History

At some point in 2007, a bed frame fell on Plaintiff's leg, completely severing his left Achilles tendon. (R. 301). The record does not contain any related medical documents, but Plaintiff told consultative examiner Alexander Panagos, M.D., that he had surgery to repair the damage. (*Id*.). Plaintiff did not undergo any formal rehabilitation or physical therapy at that time and continued to work until he was fired on September 2, 2008. (R. 73, 301). More than a year later, on September 29, 2009, he applied for disability benefits.

The first medical note in the record is from Kenneth M. Levitan, M.D., who conducted a psychiatric evaluation of Plaintiff on March 16, 2010 for the Bureau of Disability Determination Services ("DDS"). (R. 278-81). Plaintiff complained of hallucinations (hearing people calling his name and doorbells ringing) as well as paranoia, and reported that an alcohol counselor he saw in 2008 thought he may have bipolar disorder.[1] He also discussed having mood swings, with lows lasting about an hour and highs lasting about two hours. (R. 278). Plaintiff stated that he is almost always depressed, and Dr. Levitan noted that he was sad throughout the interview. (R. 278-79). Nevertheless, Plaintiff conceded that he had never received any psychiatric care or counseling and was not taking prescription medications for any mental condition. (*Id*.).

---

[1]    The counselor's purported diagnosis is not part of the record.

Plaintiff told Dr. Levitan that he gets along with other people, cooks, cleans, washes himself and manages his own finances. Despite a history of drug and alcohol abuse, he had been "totally abstinent" for a year and a half. (R. 279). On examination, Plaintiff "seemed quietly sad and anxious in a controlled way," and had difficulty concentrating. His recent and remote memory were both fair and he showed limited insight into problems, but his judgment was good. (R. 280). Dr. Levitan diagnosed Plaintiff with mixed anxiety-depression, past chronic alcoholism and chronic alcohol abuse, past chronic drug abuse (cocaine), and status post injured left leg with some residual numbness around the left ankle. Dr. Levitan opined that Plaintiff can perform "simple and routine tasks," communicate with coworkers and supervisors, and "follow and understand instructions," but "would have difficulty handling regular work pressure and stress" and "could not be relied on to retain" instructions. (R. 281).

A little less than two weeks later, on March 31, 2010, Elizabeth Kuester, M.D., completed a Psychiatric Review Technique of Plaintiff, also at the behest of DDS. (R. 282-94). Dr. Kuester diagnosed Plaintiff with mixed anxiety/depression, (R. 285), and substance addiction disorder in remission. (R. 290). She found that Plaintiff has mild restriction of activities of daily living; mild difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (R. 292). Based on Dr. Levitan's assessment, Dr. Kuester concluded that Plaintiff's complaints of "some very severe psych[iatric] s[ymptoms] are not well supported by his lack of t[reatment]." (R. 294).

In a Mental Residual Functional Capacity ("RFC") Assessment completed the same day, Dr. Kuester opined that Plaintiff is moderately limited in: the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to set realistic goals or make plans independently of others.  (R. 296-97).  In Dr. Kuester's view, Plaintiff can "learn and perform simple, routine tasks adequately with ordinary supervision."  (R. 298).

On June 20, 2010, Plaintiff started seeing Nasreen N. Ansari, M.D., an internist with Community Health Network.  Plaintiff complained of heel-to-toe numbness in his left foot but denied experiencing any pain that day.  Dr. Ansari observed a scar on Plaintiff's left lower leg but it does not appear that she prescribed any related medication at that time.  The doctor did, however, prescribe Lisinopril for Plaintiff's hypertension.  (R. 338).

Nine days later, on June 29, 2010, Dr. Panagos performed his Internal Medicine Consultative Examination of Plaintiff for DDS.  (R. 301-05).  Plaintiff complained of worsening auditory hallucinations and depression for the previous two years with intermittent suicidal thoughts.  He also discussed his past drug and alcohol abuse, as well as the injury to his Achilles tendon.  (R. 301).  Plaintiff told Dr. Panagos that he experiences pain with "weight-bearing and ambulation" that shoots from his left ankle to his pinky toe, and he often loses his balance

when his left leg buckles. (R. 302). He rated the pain at a level of 7 out of 10 and denied being able to run, crouch, squat, kneel or bend, but said he can walk 50 feet or up 20 stairs without an assistive device. (*Id*.).

Dr. Panagos noted that during the examination, Plaintiff was cooperative and exhibited a good attitude and demeanor. (*Id*.). He had full range of motion in all joints, including the left ankle, and he was able to bear his own weight and walk with a normal gait without the use of an assistive device. (R. 303). Plaintiff also had no difficulty getting on or off the exam table or getting up from a chair, and he was able to heel and toe walk and do tandem gait. (R. 303-04). Dr. Panagos diagnosed (1) "Auditory Hallucinations with Depression with no formal diagnosis"; and (2) "Completely Severed Left Lower Extremity Achilles Tendon involving tendon repair." (R. 304).

Plaintiff's next examination for DDS was a July 14, 2010 Psychiatric Evaluation with Henry Fine, M.D. (R. 307-10). Plaintiff told Dr. Fine that he was "being treated" for "[b]ad stress" and hallucinations (constantly hearing people call his name and a doorbell ringing), though he acknowledged he was not taking any related medication. (R. 307, 308). He complained of sleep disturbance but then said he was getting about six hours per night; he described his energy as "okay"; and he mentioned some "suicidality as a teen" which he attributed to drug use. (R. 307). Dr. Fine described Plaintiff as having an appropriate affect, an even mood "with some range," and no signs of "delusions, confusions or hallucinations." (R. 308-09). He diagnosed major depression, recurrent, with anxiety and mild psychotic features, and noted that Plaintiff was not receiving any

treatment for his psychiatric problems, though he "apparently self medicate[d]" with drugs and alcohol in the past. (R. 310). Dr. Fine stated that Plaintiff seemed to minimize his mental problem, and indicated that he "shows immediate memory deficit, [and] problems with fund of information." (*Id.*).

Plaintiff returned to Dr. Ansari on July 23, 2010 for more hypertension medication. (R. 337). The following month, on August 17, 2010, David Mack, M.D., determined that Plaintiff's claim for disability benefits based on his left Achilles tendon repair should be denied. (R. 329). Dr. Mack explained that Dr. Panagos's examination revealed no loss of motion in the ankle or any other area, and Plaintiff was able to walk without an assistive device, do tandem gait, heel and toe walk, and get up from a chair and onto the exam table with no difficulty. In light of these objective medical findings, Dr. Mack found Plaintiff's complaints of severe limitations to be only partially credible. (R. 331).

Shortly thereafter, on August 28, 2010, Donna Hudspeth, Psy.D., completed a second Psychiatric Review Technique of Plaintiff for DDS. (R. 311-23). Dr. Hudspeth diagnosed Plaintiff as having major depression, recurrent, with anxiety and mild psychotic features, (R. 314), and a substance abuse disorder in remission. (R. 319). She agreed with Dr. Kuester's assessment that Plaintiff has mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, but added that Plaintiff had also suffered one or two episodes of decompensation. (R. 321). Notably, Dr. Hudspeth did not explain the basis for finding any episodes of decompensation, and she

subsequently concluded that "there is a lack of treatment to support [Plaintiff's] alleged limitations." (R. 323).

In a Mental RFC Assessment completed the same day, Dr. Hudspeth opined that Plaintiff is moderately limited in: the ability to understand, remember and carry out detailed instructions; the ability to interact appropriately with the general public; and the ability to set realistic goals or make plans independently of others. (R. 325-26). Dr. Hudspeth summarized her findings by stating that Plaintiff "is able to understand, remember and perform simple two and three step tasks"; communicate with a supervisor and coworkers but not the public; make "ordinary work related decisions"; and "adapt to work schedules and the structure of a work routine." (R. 327).

Less than a week later, on September 3, 2010, Plaintiff went to Dr. Ansari for a check of his blood pressure, which was "much improved" with medication. Plaintiff reported taking Tylenol for his leg pain and newly complained of panic attacks. Dr. Ansari prescribed lorazepam to help with the anxiety. (R. 336). When Plaintiff returned to Dr. Ansari on December 3, 2010, he continued to complain of panic attacks and nerve pain in his left leg. Dr. Ansari switched Plaintiff to Valium for the panic attacks and prescribed Neurontin for the pain. (R. 335). Plaintiff saw Dr. Ansari again on April 5, 2011 for refills of his medications. He was "doing well" at that time but still reported leg pain/neuropathy with heel

pain and numbness. Dr. Ansari continued Plaintiff on Valium for anxiety and added citalopram for depression. (R. 342).[2]

## B.    Plaintiff's Testimony

In a February 13, 2010 Function Report completed in connection with his application for disability benefits, Plaintiff stated that on a typical day he watches television, eats something, paces in his house, and hears someone calling his name in his head, which makes him stressed and mad. (R. 212). He prepares simple meals for himself, cleans the house, does laundry and cares for a cat, and reported no problems with his personal grooming. (R. 213-14). He also shops for food twice a month and goes outside twice a week, traveling by foot, public transportation or bicycle, and he spends time with others two or three times a month. (R. 215-16). Plaintiff complained of difficulties with his memory, concentration and understanding, as well as problems completing tasks and following instructions, but he did not report having any problems walking. (R. 217).

Plaintiff completed a Second Function Report on June 20, 2010, this time complaining of lower back and leg pain in addition to hearing people call his name. (R. 252). He was living with a friend at that time and no longer reported riding a bicycle. (R. 252, 255). The rest of the report was largely unchanged

---

[2]     The record contains a March 31, 2012 Medical Evaluation by Dr. Ansari that Plaintiff submitted to the Appeals Council, but since this evidence was not before the ALJ at the time of her August 2011 decision, it cannot be considered as part of this appeal. (R. 349-52). *See Sarantinos v. Astrue*, No. 10 C 1196, 2011 WL 2533803, at *8 (C.D. Ill. June 27, 2011) (citing *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)) ("[E]vidence submitted for the first time to the [Appeals] Council, though technically part of the record, cannot be considered in determining the correctness of the ALJ's decision.").

from the first one, except that Plaintiff said he cannot bend, stand or walk more than three blocks without having to rest for four or five minutes. (R. 257).

At the July 14, 2011 hearing before the ALJ, Plaintiff testified that he was fired from his job at the Chicago Sun-Times in September 2008 because he hit someone during an altercation. (R. 58). He reported living with a roommate and getting along with him "fine," and said he was able to take public transportation and then walk to the hearing. (R. 62). Plaintiff described his "biggest problem" as "I can't walk, I can't stand, I can't sit." (R. 79). He said that the doctor who performed his Achilles tendon surgery told him that he suffers from "bad neuropathy" and that the feeling in his left leg probably would never come back. (R. 63, 64). He has experienced constant numbness with intermittent throbbing and burning ever since the surgery, and reported that the throbbing and burning had become constant as of three or four months prior to the hearing. (R. 64-66).

Plaintiff told the ALJ that he can walk for one block before his leg starts to burn, (R. 66), stand for five or ten minutes before needing to sit and lay down, (R. 67), sit for an hour, (R. 71), climb stairs as long as he can hold onto something, and comfortably lift 25 pounds. (R. 72). He also testified that Dr. Ansari prescribed him a cane and instructed him to lay down with his foot elevated on a pillow, though the medical records do not support either claim. (R. 64, 67). In any event, Plaintiff said he only rarely uses his prescription Neurontin for pain because it makes him nauseous, and instead relies mostly on Extra Strength Tylenol, which is effective in relieving his discomfort. (R. 68, 70). As for his mental limitations, Plaintiff denied hearing doorbells or people calling his name

anymore, but said he is anxious and depressed a lot, has trouble concentrating, experiences mood swings, and does not handle stress well.  (R. 75-78).

## C.     Vocational Expert's Testimony

Mr. Fisher testified at the hearing as a VE.  The ALJ asked him to consider a hypothetical person of Plaintiff's age, education and past work experience who can occasionally lift 50 pounds; frequently lift 25 pounds; sit, stand and walk up to 6 hours in an 8-hour workday; and push and pull without limitation; but who is limited to simple, routine, repetitive tasks with only brief, superficial contact with the general public." (R. 81-82).  The VE testified that such a person would not be able to perform Plaintiff's past work, which was semi-skilled in nature, but could still work as a stubber (1,650 jobs available), a domestic cleaner (3,600 jobs available) or an industrial cleaner (41,150 jobs available).   (R. 82).   If the individual could only frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds, he could work as a marker (6,500 jobs available), housekeeper/cleaner (9,600 jobs available) or production assembler (3,100 jobs available). (R. 83).  The marker job would remain available if the person needed to walk with a cane, as would positions as a routing clerk (3,750 jobs available) or mail clerk (1,650 jobs available).  (R. 83-84).

The VE testified that the marker, routing clerk and mail clerk positions would allow an employee to control the pace of his work, (R. 87), and are appropriate for someone with moderate difficulty in handling stress who can have no contact with the public and less than occasional contact with coworkers and supervisors.   (R. 89-90).   If the person would be off task for more than four

minutes per hour with one additional 10 to 15 minute break per day, however, then he could not sustain any employment.  (R. 85, 91-92).

## D.    Administrative Law Judge's Decision

The ALJ found that Plaintiff's "status post repair of Achilles tendon" and "major depressive disorder with anxiety" are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 34-40).  After reviewing the medical records in detail, the ALJ determined that Plaintiff has the capacity to perform light work with the following restrictions: he can frequently lift and carry 10 pounds; occasionally lift and carry 20 pounds; sit, stand or walk for 6 hours in an 8-hour workday with normal rest periods; push and pull without limitation; use a cane to walk; perform only simple, routine, repetitive tasks with brief, superficial contact with the general public; and be off task for about 4 minutes per hour, in addition to normal work breaks and one additional unscheduled 15 minute break.  (R. 40).

In reaching this conclusion, the ALJ gave significant weight to the opinions of Dr. Kuester and Dr. Hudspeth that Plaintiff is capable of understanding, remembering, and carrying out simple instructions.  The ALJ did not accept Dr. Hudspeth's assessment that Plaintiff can only perform two and three step tasks, however, noting that he could recall the details of his semi-skilled position from three years prior.  (R. 43).  The ALJ also rejected Dr. Hudspeth's finding that Plaintiff has had one to two episodes of decompensation, citing a lack of any supporting medical evidence.  (*Id*.).  With respect to Dr. Mack's opinion, the ALJ rejected his conclusion that Plaintiff's left foot injury is not severe, noting that Dr.

Panagos's findings corroborated Plaintiff's testimony regarding throbbing and loss of sensation. At the same time, the ALJ agreed that Dr. Mack's assessment supports a finding that Plaintiff can stand and walk for 6 hours in an 8-hour workday. (*Id*.). As for Dr. Levitan, the ALJ found no objective evidence to support his claims that Plaintiff cannot retain simple work instructions and would have difficulty tolerating workplace stress, and gave "very little weight" to his "incomplete assessment." (*Id*.).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of unskilled light jobs available in the national economy, including marker, routing clerk or mail clerk. (R. 45). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence,

which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[3]  A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a

---

[3]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*., and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq*.

standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.    Analysis**

Plaintiff claims that the ALJ's decision must be reversed because (1) she failed to account for all of his mental limitations, resulting in a flawed RFC; (2) the flawed RFC led to an incomplete hypothetical question to the VE, compromising the vocational testimony; (3) she provided no basis for finding him capable of performing light work; and (4) she erred in finding that he would only be off task for four minutes per hour.

**1.    Mental RFC**

Plaintiff argues that the ALJ's mental RFC assessment is flawed because it does not reflect all of his limitations. A claimant's RFC is the maximum work that he can perform despite any limitations, and is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(1); SSR 96-8p. "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'" *Craft*, 539 F.3d at 676.

The ALJ gave significant weight to opinions from Dr. Kuester and Dr. Hudspeth, who both found that Plaintiff has moderate limitations in the ability to

understand, remember and carry out detailed instructions and to maintain concentration, persistence or pace. (R. 40, 43). Dr. Kuester translated this finding into an ability to "learn and perform simple, routine tasks," (R. 298), while Dr. Hudspeth translated this into an ability to "understand, remember and perform simple two and three step tasks." (R. 327). The ALJ acknowledged both findings and determined that Plaintiff is capable of performing simple, routine, repetitive tasks. (R. 36, 37, 40). The ALJ also accepted Dr. Hudspeth's opinion that Plaintiff cannot have more than superficial contact with the general public, (R. 40, 327), and further limited him to jobs that can be performed at his own pace with less than occasional contact with coworkers and supervisors. (R. 44, 45).

Plaintiff first objects to the ALJ's omission of the "two and three step tasks" restriction as set forth by Dr. Hudspeth. (Doc. 20, at 7). Neither party cites any authority addressing whether a limitation to simple two and three step tasks is functionally different than a limitation to simple, routine and repetitive ones. Nor do they discuss whether the available light and unskilled marker, routing clerk and mail clerk jobs cited by the VE actually involve more than three-step tasks.

Regardless, the ALJ explained that both Dr. Kuester and Dr. Hudspeth found Plaintiff "capable of understanding, remembering, and carrying out simple instructions," and she reasonably adopted Dr. Kuester's additional restriction to routine tasks. (R. 43, 296, 325). Indeed, the ALJ went even further and imposed a limitation to repetitive tasks as well. (R. 43). Though the ALJ did not expressly articulate why she omitted the two and three step task limitation, she did observe

that Plaintiff "still remembered the tasks of his semi-skilled position which ended almost three years [prior]." (R. 43). To be sure, Plaintiff provided detailed testimony about the multi-step requirements of his mailer job, the difference between working the "night shift" versus the "daily paper," the types of machinery used, and the movement to different positions every 10 minutes to prevent getting "bored." (R. 56-58).

Plaintiff claims this analysis is inadequate given that the ALJ purportedly afforded significant weight to Dr. Hudspeth's opinion but then failed to adopt all of her stated limitations. (Doc. 20, at 7-8; Doc. 25, at 3). The Seventh Circuit has made clear, however, that "[a]n 'ALJ is not required to rely entirely on a particular physician's opinion . . .' in making an RFC determination." *Crawford*, 633 F. Supp. 2d at 635 (quoting *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)). As noted, the ALJ discussed Dr. Hudspeth's opinion in detail and clearly accepted certain portions of her findings, including that Plaintiff is unable to perform more than simple tasks and requires minimal public contact. At the same time, the ALJ reasonably adopted other limitations as articulated by Dr. Kuester, including that Plaintiff can perform simple, routine and repetitive unskilled tasks without additional step restrictions. The Court is satisfied that the ALJ built a logical bridge between the evidence and her conclusion in this regard, and that her decision is supported by substantial evidence. *See Young v. Sullivan*, No. 91 C 7703, 1992 WL 212588, at *5 (N.D. Ill. Aug. 27, 1992) (citing *Walker v. Bowen*, 834 F.2d 635, 644 (7th Cir. 1987)) ("[A]n ALJ may accept

portions of a . . . physician's analysis while rejecting other portions that are incompatible with the record as a whole.").

For similar reasons, the ALJ did not err in rejecting Dr. Levitan's opinion that Plaintiff cannot retain simple work instructions. As the ALJ explained, "there are no objective signs in the report to support" such a finding, and Plaintiff "recalled in detail the tasks he performed at jobs performed years ago, contradicting Dr. Levitan's opinion." (R. 43). Plaintiff claims that there were in fact objective signs of memory problems, namely, he could not recall the date, the doctor's name, or more than three digits backwards, and he was unable to perform serial sevens. (Doc. 25, at 5). Of course, Dr. Levitan also found that Plaintiff remembered his office address and how he got there, could do simple addition and subtraction, and could recall five digits forwards. (R. 280).

Moreover, the ALJ thoroughly discussed the mental RFC assessments of record, neither of which indicated that Plaintiff would have trouble retaining simple instructions. In that regard, Dr. Kuester found that based on Dr. Levitan's analysis, Plaintiff has the RFC to "*learn* and perform simple, routine tasks," (R. 298) (emphasis added), and Dr. Hudspeth agreed that Plaintiff can "*understand*, *remember*, and perform simple . . . tasks." (R. 327) (emphasis added). Plaintiff denies that his ability to recall past tasks has any bearing on his ability to learn new ones, but since he does not point to any contrary RFC in the record, the ALJ's statement in that regard is not reversible error. *See White v. Astrue*, No. 12 C 4039, 2013 WL 4080667, at *14 (N.D. Ill. Aug. 13, 2013) (citing *Craft*, 539

F.3d at 678) ("The ALJ will determine which . . . doctors' opinions should receive weight.").[4]

Plaintiff argues that the ALJ nevertheless erred in failing to accept Dr. Levitan's additional finding that he would have "difficulty handling regular work pressure and stress." (R. 281). Though the ALJ found no objective support for this conclusion, she did limit Plaintiff to jobs that "provide for reduced workplace stress, consistent with Dr. Levitan's report." (R. 43). Specifically, the VE testified that the marker, routing clerk and mail clerk jobs all involve brief, superficial contact with the general public and less than occasional contact with coworkers and supervisors, and they allow for Plaintiff to work at his own pace. (R. 44, 45). Plaintiff insists this is inadequate, claiming that the VE "testified that a person who cannot tolerate work place stressors would not be able to perform" any of the listed jobs. (Doc. 20, at 9). This is incorrect.

The VE stated that a person who is *markedly* limited in handling workplace stress would not be able to perform the cited jobs, but that they remain available to a person who is only *moderately* limited in that area. (R. 89). Contrary to Plaintiff's suggestion, Dr. Levitan did not indicate that Plaintiff has more than a

---

[4]     There is also no merit to Plaintiff's suggestion that the ALJ somehow violated 20 C.F.R. § 404.1527(c)(1) by giving "more weight to Dr. Kuester's review of Dr. Levitan's opinion than to Dr. Levitan's actual opinion." (Doc. 20, at 9-10). Unlike Dr. Kuester, Dr. Levitan did not prepare a "complete functional assessment" of Plaintiff's abilities. (R. 43). In addition, though an ALJ "generally affords more weight to the opinion of a source who has examined a claimant than to the opinion of a source who has not, the weight ultimately given to that opinion depends on its consistency with and objective medical support in the record; the quality of the explanation the source gave for the opinion; and the source's specialization." *Givens v. Colvin*, __ Fed. Appx. __, 2013 WL 6623179, at *5 (7th Cir. 2013). As stated earlier, the ALJ reasonably concluded that Dr. Levitan's assessment was not supported by objective signs and was contradicted by Plaintiff's testimony at the hearing. *Id.* (ALJ did not err in discounting examining physician's opinion where it was inconsistent with objective testing and appeared to be based on the plaintiff's complaints rather than the examination).

moderate limitation from stress. Moreover, Dr. Kuester opined that Plaintiff can "relate acceptably," "make basic work decisions and cope with work demands," (R. 36, 298), and Dr. Hudspeth agreed that Plaintiff can "make ordinary work related decisions" and "adapt to work schedules and the structure of a work routine." (R. 37, 327). Plaintiff notes that Dr. Levitan reported ongoing anxiety and leg swinging throughout his exam, but this is insufficient to overcome the uncontroverted RFC evaluations. (Doc. 25, at 4) (citing R. 278-80). The ALJ's decision to rely on the findings from Dr. Kuester and Dr. Hudspeth is adequately explained and supported by substantial evidence. *Compare Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (ALJ impermissibly "played doctor" where he "decided, absent medical evidence, that [the claimant's] condition was less serious because it was treated only with oral medication and not with insulin therapy.").

Plaintiff finally argues that the ALJ should have "consider[ed] how his auditory hallucinations would impact [his] ability to remain on task." (Doc. 20, at 9). The Court is satisfied that she did. The ALJ acknowledged that Plaintiff complained of auditory hallucinations to Dr. Levitan, Dr. Panagos and Dr. Fine, (R. 35-37), and there is no dispute that both Dr. Kuester and Dr. Hudspeth considered these hallucinations in preparing their RFC assessments. (R. 294 (referencing "hallucinations"), 323 (referencing "auditory hallucinations")). As a result, there is no conflict between the stated RFCs (which considered hallucinations) and Dr. Fine's finding of hallucinations. (Doc. 25, at 6) (citing *Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008)) (remand necessary where

ALJ did not resolve conflict between two doctors who thought the plaintiff needed to avoid extreme temperatures and a third doctor who stated extreme temperatures would not affect him). Plaintiff does not identify any physician who imposed additional limitations based on his auditory hallucinations, or suggested that they would prevent him from working.

In sum, the ALJ's mental RFC determination reasonably accounts for all of Plaintiff's psychological limitations and is supported by substantial evidence in the record.

### 2. VE Testimony

Plaintiff next argues that the case must be remanded because the ALJ did not properly account for his mental limitations in the hypothetical question to the VE. (Doc. 20, at 11). Rather than telling the VE that the hypothetical person had moderate limitations with concentration, persistence or pace, the ALJ asked about a person who could perform "simple, routine, repetitive tasks with only brief superficial contact with the general public." (R. 82). Relying on *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), and related cases, Plaintiff stresses that "employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *Id*. at 620.

This argument ignores the fact that Dr. Kuester translated Plaintiff's moderate limitations into an ability to "learn and perform simple, routine tasks," (R. 298), and Dr. Hudspeth translated the limitations into an ability to "understand, remember and perform simple . . . tasks." (R. 327). Where, as

here, "a medical expert 'translated an opinion of the claimant's medical limitations into an RFC assessment' an ALJ may rely upon that translation." *Adams v. Astrue*, 880 F. Supp. 2d 895, 912 (N.D. Ill. 2012) (quoting *Milliken v. Astrue*, 397 Fed. Appx. 218, 221-22 (7th Cir. 2010)).

Plaintiff suggests that Dr. Kuester did not translate all of his limitations, such as his "moderate restriction in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Doc. 25, at 8). To the contrary, Dr. Kuester found that Plaintiff can "relate acceptably" and "make basic work decisions and cope with work demands." (R. 298). Dr. Hudspeth likewise determined that Plaintiff can "make ordinary work related decisions" and "adapt to work schedules and the structure of a work routine." (R. 327). Plaintiff complains that Dr. Kuester did not have access to Dr. Fine's report, but Dr. Hudspeth did review that report, and together, she and Dr. Kuester considered all of the relevant medical evidence. (Doc. 25, at 8).

To the extent Plaintiff objects that the hypothetical question failed to include limitations for two and three step tasks, difficulty retaining instructions, difficulty handling stress, and auditory hallucinations, the Court has already determined that the stated mental RFC properly accounted for all of these problems. (Doc. 25, at 7-8). The hypothetical questions to the VE drawn from that RFC were also proper. *See Simila*, 573 F.3d at 521 ("[T]he ALJ is required

only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.") (internal quotations omitted).

### 3. Physical RFC

Plaintiff claims that the ALJ still erred in finding him capable of light work. This argument is based in large measure on the fact that the ALJ gave "little or no weight" to Dr. Mack's opinion that Plaintiff's left foot injury is not severe, but gave "significant weight" to his opinion that "there is no medical evidence which supports a finding that [Plaintiff] could not stand and walk for at least six hours in an eight hour workday." (R. 43). According to Plaintiff, "[t]he decision cannot be sustained with the contradicting findings of both giving no weight and significant weight to the same opinion." (Doc. 25, at 11). As noted earlier, however, "[a]n 'ALJ is not required to rely entirely on a particular physician's opinion . . .' in making an RFC determination." *Crawford*, 633 F. Supp. 2d at 635. *See also Young*, 1992 WL 212588, at *5.

Here, the ALJ accepted that Plaintiff's complaints of throbbing and loss of sensation in his left leg were consistent with observations from Dr. Panagos and thus supported a finding that the leg impairment is severe. (R. 43). The ALJ also concluded, however, that this severe impairment does not preclude Plaintiff from standing and walking for 6 hours in an 8-hour workday. The Court sees nothing inconsistent about these two findings. *Compare Mazzuca v. Colvin*, No. 12 C 2907, 2013 WL 1343344, at *8, 9 (N.D. Ill. Apr. 2, 2013) (ALJ erred by rejecting a treating physician's report "out of hand" and then "rely[ing] on it to support the RFC findings.").

Plaintiff stresses that Dr. Mack did not actually find him capable of standing and walking for 6 hours, claiming the ALJ's statement in that regard is "misleading." (Doc. 20, at 13). While it is true that Dr. Mack imposed no specific ambulatory restrictions, he based his assessment of no disability on the consultative findings from Dr. Panagos. (R. 331). Dr. Panagos, in turn, observed that Plaintiff had full range of motion in his left ankle; was able to bear his own weight and walk with a normal gait without an assistive device; had no difficulty getting on or off the exam table or getting up from a chair; and could heel and toe walk and do tandem gait. (R. 302-04).

The ALJ discussed Dr. Panagos's report in detail, (R. 36), and noted that Dr. Ansari treated Plaintiff four times between June 28, 2010 and December 3, 2010 before prescribing any pain medication (Neurontin).[5] (R. 38). The ALJ also pointed out that even after getting the prescription, Plaintiff "primarily utilized over the counter Tylenol to relieve discomfort in his left foot." (R. 38, 42). *See Burnam v. Colvin*, 525 Fed. Appx. 461, 464 (7th Cir. 2013) (denial of benefits affirmed where the plaintiff managed her pain with "conservative treatment, including physical therapy and Tylenol."). Finally, the ALJ found it significant that Dr. Ansari "did not recommend any additional follow up or refer [Plaintiff] to a specialist" despite ongoing complaints of leg pain, (R. 38), and "there have been

---

[5] Plaintiff incorrectly claims that Dr. Ansari "observed that [he] could not stand for more than twenty minutes." (Doc. 25, at 12). In truth, Dr. Ansari merely noted on September 3, 2010 that Plaintiff complained that he cannot stand for more than 20 minutes. (R. 336).

no studies to confirm nerve damage since [Plaintiff] began seeking treatment from Dr. Ansari." (R. 42).

Given these objective findings, the Court disagrees with Plaintiff that the ALJ somehow rejected all of the medical sources of record and then made her own lay assessment that he can walk for 6 hours in an 8-hour workday. Notably, Plaintiff does not identify any physician who found him more limited, or point to specific medical evidence that supports his claim in that regard. *Compare Suide v. Astrue*, 371 Fed. Appx. 684, 689-90 (7th Cir. 2010)) (remand necessary where the ALJ's rejection of a physician's reports led to an "evidentiary deficit" and "[t]he rest of the record simply d[id] not support the parameters included in the ALJ's [RFC] determination."); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (ALJ erred in finding claimant capable of light work where she "did not identify any medical evidence to substantiate her belief that [the claimant] is capable of meeting those requirements.").

In the absence of any corroborating objective evidence, Plaintiff turns to his own testimony to prove he cannot stand and walk as required for light work. (Doc. 20, at 14). Specifically, Plaintiff says that he experiences pain and throbbing in his ankle; he needs to lie down with his foot elevated on a pillow during the day; he cannot walk more than a block at a time; he needs to use a cane; he has to sit after standing for 5 to 10 minutes; he cannot sit for more than an hour due to throbbing and burning pain in his heel and foot; and he has difficulty walking on stairs. (*Id*.). This argument fails because the ALJ reasonably concluded that much of the cited testimony was not credible. (R. 42).

In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

For reasons already discussed, Plaintiff's symptoms are not supported by objective medical evidence. As for other evidence of record, the ALJ noted the following: (1) after injuring his Achilles tendon in 2007, Plaintiff continued to work at a medium level job until he was fired in September 2008, and he "did not mention leaving his job because of his injured left foot"; (2) Plaintiff's testimony that he has experienced continuous numbness and throbbing in his foot since the injury "is contradicted by the absence of treatment evidence prior to his filing an application for benefits"; (3) Plaintiff testified that the burning did not start until four to five months prior to the hearing; and (4) Plaintiff said that he does not take Neurontin because it upsets his stomach, but there is no record of any such complaints in the treatment notes. (R. 42). Though the ALJ did not accept

Plaintiff's unsubstantiated claim that Dr. Ansari instructed him to raise his leg during the day, she did give him the benefit of the doubt regarding his need to use a cane.  (R. 40, 44).

Plaintiff's only objection to these observations is that the ALJ should not have relied on his failure to seek treatment without also considering the fact that he "lacked insurance or financial resources."  (Doc. 25, at 10 n.1) (citing *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)) (ALJ cannot discredit testimony based on gaps in treatment history without exploring whether the claimant has "good reasons" for the inconsistency).  Tellingly, however, Plaintiff does not claim that he in fact declined to pursue treatment because he could not afford it.  Indeed, the only time Plaintiff mentioned finances was in the context of seeing a counselor for his anxiety attacks.  (R. 74).

Viewing the record as a whole, there is ample support for the ALJ's physical RFC determination and Plaintiff's request for remand on this basis is denied.

### 4.    Time Off Task and Breaks

Plaintiff finally seeks remand based on the ALJ's determination that he will only be off task for four minutes per hour, and only needs one unscheduled 15-minute break in addition to his normal breaks.  Several of Plaintiff's initial arguments on this point reflected his belief that the off-task and break time relate to his mental limitations.  (Doc. 20, at 16-18).  The ALJ made it clear, however, that these accommodations actually "address reported throbbing and burning symptoms in his left foot."  (R. 44).

Plaintiff insists that there is still no record basis for the ALJ's finding, questioning "why the ALJ concluded an additional fifteen minute break, and the ability to remain off task four minutes per hour would accommodate [his] constant pain." (Doc. 20, at 15). With respect to the time off task, moreover, Plaintiff wonders why he would only need four minutes, as opposed to "five or ten minutes." (Doc. 25, at 13). In Plaintiff's view, "[t]he only discernible reasoning . . . for the ALJ choosing the four minute off task increment . . . are the exchanges between the ALJ and the vocational expert" in that regard indicating that the jobs he cited would tolerate an employee being off task that specific amount of time. (*Id*. at 14; R. 84-85). Such an analysis is improper, Plaintiff says, because an ALJ cannot "simply adopt[] the VE's testimony regarding permissible off-task time in the work force." *Washington v. Colvin*, No. 12 C 4995, 2013 WL 1903247, at *11 (N.D. Ill. May 7, 2013).

The problem for Plaintiff is that no physician of record found that he would be off task due to pain for any amount of time during the workday, or that he would require unscheduled breaks of any duration. Rather, the ALJ imposed these additional restrictions to accommodate Plaintiff's testimony regarding the throbbing and burning symptoms. *See, e.g., Castile*, 617 F.3d at 929 (finding no error where "[i]t was because of and not in spite of [the claimant's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record."). These facts easily distinguish *Washington*, where the ALJ improperly discredited the plaintiff's testimony solely because it was unsupported by objective evidence of record; ignored medical evidence that in

fact supported the plaintiff's statements; and then held that the plaintiff would only be off task for 10% of the workday "without any explanation."   2013 WL 1903247, at *10-11.  Plaintiff may believe that he would be off task for a longer period of time and need more breaks, but that is insufficient to establish that the ALJ's finding was erroneous.[6]

## **CONCLUSION**

For the reasons stated above, Plaintiff's request for reversal or remand of the ALJ's decision is denied.  The clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: May 5, 2014

_____
SHEILA FINNEGAN
United States Magistrate Judge

---

[6]    Plaintiff argues in cursory fashion that the ALJ "engaged in backward reasoning" by finding him credible "only to the extent his allegations were not inconsistent with the [RFC]."  (Doc. 25, at 14).  Given the ALJ's detailed discussion of Plaintiff's symptoms and testimony, and the reasons she did not find them fully credible, however, the use of such boilerplate language does not provide a basis for remand.  *See Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013) (credibility determination affirmed despite use of boilerplate language where ALJ went on to explain her findings).